# Exhibit 1

## To the Reply Declaration
## of Zachary M. Mattison

UNITED STATES DISTRICT COURT
EASTERN DISTRICT OF NEW YORK
-------------------------------------------------------------------X
JAMES M. MALONEY,

                Plaintiff,

      - against -

KATHLEEN M. RICE,

              Defendant.

-------------------------------------------------------------------X

Case No. 03-CV-786
(PKC) (ARL)


# MEMORANDUM OF LAW IN SUPPORT OF PLAINTIFF'S
## POST-REMAND RULE 56 MOTIONS FOR SUMMARY JUDGMENT
### IN WHOLE OR PART AS TO THE FIRST AND THIRD CAUSES OF ACTION


James M. Maloney (JM-5297)
Plaintiff pro se
33 Bayview Avenue
Port Washington, New York

(516) 767-1395

TABLE OF CONTENTS

PRELIMINARY STATEMENT . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 1

INTRODUCTION . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 1

ARGUMENT . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 3

POINT I

      UNDER *HELLER*, NEW YORK'S BAN ON SIMPLE POSSESSION OF
      NUNCHAKU IN ONE'S HOME IS UNCONSTITUTIONAL . . . . . . . . . . 3

POINT II

      THE DISTRICT ATTORNEY VIOLATED PLAINTIFF'S DUE
      PROCESS RIGHTS BY DISCLOSING OR PERMITTING TO BE
      DISCLOSED, IN ORDER TO ADVANCE HER POSITION IN THIS
      LITIGATION, THAT "PLAINTIFF WAS LISTED ON THE NEW
      YORK STATE CHILD ABUSE AND MALTREATMENT
      REGISTER," AND BY FAILING TO RETRACT THAT
      DISCLOSURE AFTER SHE WAS PUT ON NOTICE THAT IT
      HAD BEEN MADE AND THAT IT WAS STATUTORILY
      CONFIDENTIAL UNDER THREAT OF CRIMINAL PENALTY . . . . . . 9

           Introduction . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 9
           Plaintiff's Listing on the SCR . . . . . . . . . . . . . . . . . . . . . . . . . . 11
           The § 1983 Claim Against RICE . . . . . . . . . . . . . . . . . . . . . . . . 16
           Section 422 of the New York Social Services Law . . . . . . . . . . . . 19

           CONCLUSION . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 21

PRELIMINARY STATEMENT

This memorandum of law is submitted in support of Plaintiff's post-remand Rule 56 motions for summary judgment in whole and part. This is primarily an action for declaratory judgment, seeking a declaration that those portions of sections 265.00 and 265.01 of the New York Penal Law, to the extent that those statutes define and punish as a crime the simple possession of "nunchaku" (the transliterated Japanese term for a martial arts weapon of Okinawan origin, properly used for both singular and plural) within one's home, are unconstitutional and of no force and effect. This action does *not* challenge and has never challenged the application of the statutes to the possession of nunchaku in any other location than the possessor's home.

INTRODUCTION

Under the terms of the applicable statutes (codified at sections 265.00 and 265.01 of the New York Penal Law), the simple in-home possession of "chuka sticks" (synonymous with "nunchaku," and statutorily defined, in brief, as "any device designed primarily as a weapon, consisting of two or more lengths of a rigid material joined together by a thong, rope or chain," New York Penal Law § 265.00 (14)) could subject the possessor to conviction of a misdemeanor and one year in prison.

It is widely accepted as historical fact that the nunchaku was an agricultural implement first adapted for use as a martial-arts weapon by the people of Okinawa as part of the development of karate during the early Seventeenth Century, just after the Japanese Satsuma clan had invaded that island and banned the possession of "traditional" weapons such as the sword and spear.  Ironically, the New York legislature, in having defined as a crime the simple possession of nunchaku in its citizens' homes, has gone even further than did the Seventeenth-Century invaders of Okinawa (who banned "traditional" weapons but presumably *not* the nunchaku).  The primary question now squarely before this Court is whether the Second Amendment to the Constitution of the United States today protects citizens against this state's 40-year-old legislative decision to criminalize the simple possession of "two or more lengths of a rigid material joined together by a thong, rope or chain" in the private homes of those citizens.

ARGUMENT

POINT I

UNDER *HELLER*, NEW YORK'S BAN ON SIMPLE POSSESSION OF
NUNCHAKU IN ONE'S HOME IS UNCONSTITUTIONAL

In *District of Columbia v. Heller*, 554 U.S. 570 (2008), the Supreme Court

defined "arms" (the object of Second Amendment protection) as follows:

> Before addressing the verbs "keep" and "bear," we interpret
> their object: "Arms." The 18th-century meaning is no different from
> the meaning today. The 1773 edition of Samuel Johnson's dictionary
> defined "arms" as "weapons of offence, or armour of defence." 1
> Dictionary of the English Language 106 (4th ed.) (reprinted 1978)
> (hereinafter Johnson). Timothy Cunningham's important 1771 legal
> dictionary defined "arms" as "any thing that a man wears for his
> defence, or takes into his hands, or useth in wrath to cast at or strike
> another." 1 A New and Complete Law Dictionary; see also N.
> Webster, American Dictionary of the English Language (1828)
> (reprinted 1989) (hereinafter Webster) (similar).
>
> The term was applied, then as now, to weapons that were not
> specifically designed for military use and were not employed in a
> military capacity.

554 U.S. at 581.

Under the above definition, "arms," the keeping and bearing of which are

rights protected by the Second Amendment under *Heller*,[1] is a broader term than

"firearms."  Put another way, the Second Amendment is about more than guns.

---

[1] The Second Amendment was subsequently "incorporated," i.e., made applicable to the
States, in *McDonald v. Chicago*, 561 U.S. 3025 (2010)

The Supreme Court's application of the Second Amendment to "arms" is not, however, without important limitations concerning the types of arms that may properly be associated with Second Amendment rights.

As an initial consideration, the *Heller* majority squared its holding with that in *United States v. Miller*, 307 U.S. 174 (1939), writing:

> We may as well consider at this point (for we will have to consider eventually) what types of weapons *Miller* permits. . . . We think that *Miller*'s "ordinary military equipment" language must be read in tandem with what comes after: "[O]rdinarily when called for [militia] service [able-bodied] men were expected to appear bearing arms supplied by themselves and of the kind in common use at the time." 307 U.S., at 179, 59 S. Ct. 816. The traditional militia was formed from a pool of men bringing arms "in common use at the time" for lawful purposes like self-defense. . . . Indeed, that is precisely the way in which the Second Amendment's operative clause furthers the purpose announced in its preface. We therefore read Miller to say only that *the Second Amendment does not protect those weapons not typically possessed by law-abiding citizens for lawful purposes*, such as short-barreled shotguns.

554 U.S. at 624-625 (citations omitted) (emphasis added).

It follows that, in order to give rise to, or be associated with, Second Amendment protection, the nunchaku must be a weapon "typically possessed by law-abiding citizens for lawful purposes." Perhaps the best evidence that the nunchaku was "typically possessed by law-abiding citizens for lawful purposes"—right here in New York and at the very time that this state enacted its

complete ban on the instrument even for peaceful purposes in one's own home—is

the memorandum to the Governor dated April 4, 1974, from the State of New

York Executive Department's Division of Criminal Justice Services ("CJS

Memo"), which pointed out that nunchaku have legitimate uses in the martial arts

and opined that "in view of the current interest and participation in these activities

by many members of the public, it appears unreasonable—and perhaps even

unconstitutional—to prohibit those who have a legitimate reason for possessing

chuka sticks [nunchaku] from doing so."  Document 116-1 (Exhibit 1 to Second

Amended Verified Complaint); *see also* JMM 56.1 ¶ 2.[2]

That the nunchaku may be—and frequently is—possessed by law-abiding

citizens was also recognized by several courts shortly after New York's 1974 total

ban on the weapon.  For example, in 1982, the Supreme Court of Hawaii wrote:

> [N]unchakus [*sic*] developed into a defensive weapon against
> the samurai's sword. Today, nunchaku sticks are widely used in
> the martial arts to build up dexterity, timing, mind and body
> coordination . . . .

*State v. Muliufi*, 64 Haw. 485, 643 P.2d 546 (Haw. 1982).

Similarly, the District of Columbia Court of Appeals noted in 1983:

> Like the courts of other jurisdictions, we are cognizant of the

---

[2] References herein to paragraphs in the Rule 56.1 Statement submitted
herewith are designated "JMM 56.1 ¶ ___."

cultural and historical background of this Oriental agricultural
implement-turned-weapon. We recognize that the nunchaku has
socially acceptable uses within the context of martial arts and
for the purpose of developing physical dexterity and
coordination.

*In re S.P., Jr.*, 465 A.2d 823, 827 (D.C. 1983).

In 1984, the Ohio Court of Appeals reversed a criminal conviction for
possession of nunchaku, holding that "the evidence tends to indicate that the
device was used only for lawful purposes" and that "[m]ere possession of an
otherwise lawful article . . . does not make it illegal." *State v. Maloney*, 470 N.E.2d
210, 211 (Ohio Ct. App. 1984).

This Court has already recognized that "the martial arts generally, and
perhaps use of nunchaku in particular, have a rich history and are culturally
significant to many people in many parts of the world." *Maloney v. Cuomo*, 470
F. Supp. 2d 205, 213 (E.D.N.Y. 2007).[3] As evidenced by the CJS Memo, *supra*,
as of 1974 the nunchaku was already an accepted part of martial-arts practice here

---

[3]   As the *Muliufi* court opined only eight years after New York's total ban on "chuka
sticks" was enacted, the use of nunchaku in the martial arts is "socially acceptable and lawful
behavior, especially here in Hawaii where the oriental culture and heritage play a very important
role in society." *Muliufi*, 64 Haw. at 489, 643 P.2d at 549. New York is arguably no less a
"melting pot" than is Hawaii, yet it is safe to say that no legislative body here or in any other
American state would seriously consider a *per se* ban on the possession of such items as baseball
bats, darts, hockey sticks or fencing equipment, as was so readily done four decades ago with the
nunchaku. Indeed, the very fact that New York's legislature chose to refer to the instrument as
"chuka sticks" rather than nunchaku speaks volumes as to the ease of passing the 1974 nunchaku
ban notwithstanding the documented legitimate use and possession by many New Yorkers.

in New York, but that practice was, beginning in that year and for the next four decades, eliminated or driven underground by the complete ban on the instrument.

There can be little doubt that the nunchaku is a weapon "typically possessed by law-abiding citizens for lawful purposes." Indeed, the main reason that citizens of New York may not be "law-abiding" if they possess nunchaku, especially in their homes,[4] is simply because of that ban. (Plaintiff wishes to be law-abiding.)

A related consideration, although not strictly required under *Heller*, is that the nunchaku has historically had a reasonable relationship to a citizens' militia, namely, the people of Okinawa in the early 17th Century, who used the instrument in an attempt to resist occupation by the invading Japanese samurai of Satsuma. See JMM 56.1 ¶ 3 and sources cited therein. *Heller* interpreted the connection-to-a-militia requirement earlier enunciated in *Miller* to mean that a weapon associated with Second Amendment protections must be of the sort "typically possessed by law-abiding citizens for lawful purposes," on the basis that "[t]he traditional militia was formed from a pool of men bringing arms 'in common use at the time' for lawful purposes," *see* block-quoted passage from *Heller* (explaining *Miller*) beginning at page 4, *supra*. But here, in the case of nunchaku, there is also an

---

[4] *Cf. Heller*, 554 U.S. at 635 (Second Amendment "elevates above all other interests the right of law-abiding, responsible citizens to use arms in defense of hearth and home").

*actual* militia connection, and one that predates the drafting and ratification of the

Bill of Rights by nearly two centuries.

Turning to the final consideration (and the one that will likely be the most

debated in the briefing of this motion), the *Heller* Court wrote:

> We also recognize another important limitation on the right to
> keep and carry arms. *Miller* said, as we have explained, that the sorts
> of weapons protected were those "in common use at the time." . . . We
> think that limitation is fairly supported by the historical tradition of
> prohibiting the carrying of "dangerous and unusual weapons."

554 U.S. at 627 (citations omitted).

Here, however, no challenge is being brought to New York's prohibition on

*carrying* nunchaku, so the question of whether it is a "dangerous and unusual

weapon" subject to the above-referenced historical prohibition is not before this

Court. In any event, what the Supreme Court appeared to have in mind when

considering "dangerous and unusual weapons"—given the opinion's very next

paragraph (referring to M-16 rifles) and given the context of addressing *Miller*'s

upholding the prohibition on transporting a sawed-off shotgun, were weapons of

exceptional destructive capacity, of which the nunchaku is simply not an example

when compared to such weapons as military rifles and sawed-off shotguns.

In sum, under *Heller*, the right to possess nunchaku in one's own home for

legitimate purposes is constitutionally protected conduct.

POINT II

THE DISTRICT ATTORNEY VIOLATED PLAINTIFF'S
DUE PROCESS RIGHTS BY DISCLOSING OR PERMITTING
TO BE DISCLOSED, IN ORDER TO ADVANCE HER POSITION
IN THIS LITIGATION, THAT "PLAINTIFF WAS LISTED ON
THE NEW YORK STATE CHILD ABUSE AND MALTREAT-
MENT REGISTER," AND BY FAILING TO RETRACT
THAT DISCLOSURE AFTER SHE WAS PUT ON NOTICE THAT
IT HAD BEEN MADE AND THAT IT WAS STATUTORILY
CONFIDENTIAL UNDER THREAT OF CRIMINAL PENALTY

Introduction

In addition to moving for summary judgment on the question of the

constitutionality of those portions of sections 265.00 and 265.01 of the New York

Penal Law to the extent that those statutes define and punish as a crime the simple

possession of nunchaku within one's home, discussed *supra*, Plaintiff also moves

this Court for partial summary judgment on the question of whether the District

Attorney violated Plaintiff's due process rights by disclosing, or permitting to be

disclosed, *in order to advance her position in this litigation*, that "Plaintiff was

listed on the New York State Child Abuse and Maltreatment Register," and by

failing to retract that disclosure after she was formally put on notice that it had

been made *and* that it was statutorily confidential under threat of criminal penalty.

It is submitted that the *sui generis* nature of such a situation, in which a

public servant charged with enforcing the criminal law, engages in conduct that

itself is arguably in violation of a criminal provision,[5] should call into question even the applicability of the "stigma-plus" standard that has evolved in the context of less egregious situations involving public servants and reputational harm.

As this is a motion for partial summary judgment, material facts regarding past pecuniary damages, which may be disputed, are not addressed here.  These were addressed in detail in the context of the Rule 15 motion that was made upon remand (Documents 101-117, *q.v.*), whereby, *inter alia*, the new Third Cause of Action that is now the subject of this motion was permitted to be pleaded anew following remand from the United States Supreme Court and the Second Circuit.

In truth, the past pecuniary damages discussed therein are of far lesser concern to Plaintiff, and would be to any reasonable person, than are the obvious continuing harms of the complained-of disclosure's remaining on an easily replicated public document for, one must assume, the remainder of Plaintiff's life.

---

[5] Section 422 of the New York Social Services Law provides, at subdivision 12, that "[a]ny person who willfully permits and any person who encourages the release of any data and information contained in the central register to persons or agencies not permitted by this title shall be guilty of a class A misdemeanor."  Whether RICE's conduct is or is not technically a violation of that provision is not the question.  That such a provision exists, and that it is indisputably in place to protect the due process rights of those who have been listed on the SCR (especially those who, like Plaintiff, had yet to receive a fair hearing), is the point. Even after having been placed on formal notice, RICE failed to retract the disclosure, leaving it in a public document to be widely disseminated in electronic perpetuity.  Most shocking of all, this was all done in order to advance RICE's position in a civil matter.

<u>Plaintiff's Listing on the SCR</u>

Being listed on the New York State Central Register ("SCR") of Child

Abuse and Maltreatment means that one has been identified by the New York

State Office of Children and Family Services (the "OCFS"), and/or by a child

protective services agency within a local social services district, as the "subject" of

an "indicated" report of "child abuse or maltreatment." *See generally Finch v.*

*New York State Office of Children and Family Services*, 499 F. Supp. 2d 521

(S.D.N.Y. 2007). As that court explained:

> The OCFS operates the SCR. The purpose of the SCR is to
> have, in one central location, the names of all known subjects of
> indicated reports of child abuse and maltreatment in New York State
> so that the information may be used when needed to conduct
> appropriate investigations and database checks, either for the
> protection of children named in those reports or for the protection of
> other children who might come into contact with the subject of the
> report. The SCR receives telephone calls alleging child abuse or
> maltreatment. When any allegations contained in such telephone
> calls could reasonably constitute a report of child abuse or
> maltreatment of a child located in the City of New York, such
> allegations are immediately transmitted by the SCR to the [child
> protective services agency within a local social services district] for
> investigation. The [child protective services agency within a local
> social services district] investigates the allegations and determines
> whether the report of child abuse or maltreatment is "indicated" or
> "unfounded." A report is indicated if an investigation determines
> that *some credible evidence* of the alleged abuse or maltreatment
> exists. A report is unfounded if it is not indicated. The person who
> is allegedly responsible for causing abuse or maltreatment to a child
> is referred to as the "subject of the report."

*Id.* at 526 (footnotes omitted) (emphasis added).

Although, as stated above, the statutory standard for determining whether a report is "indicated" is "some credible evidence" of abuse or maltreatment, the Second Circuit has held that a higher standard, a "fair preponderance of the evidence," is required to satisfy the requirements of due process. *Valmonte v. Bane*, 18 F.3d 992 (2d Cir. 1994). Unfortunately, lengthy delays in obtaining administrative "fair hearings" to adjudicate whether a fair preponderance of evidence exists that would support listing on the SCR have long been commonplace. Notably, when such hearings are eventually held, there is a high rate of "expungement," that is, "indicated" reports are found *not* to have been supported by a fair preponderance of evidence. *See Finch, supra,* where the court recognized the "high expungement rate," 499 F. Supp. 2d at 536, and, responding to complaints of delays in scheduling such hearings, noted that "[u]ntil today [July 3, 2007, before the filing of RICE's brief], no court has held that the inordinate delay in scheduling administrative hearings may itself violate a listed person's right to due process." *Id.* at 538.

When Defendant RICE made the disclosure in her brief that "Plaintiff was listed on the New York State Child Abuse and Maltreatment Register," Plaintiff himself had yet to receive his fair hearing, although he had requested that the

report be amended to "unfounded" promptly upon receiving notice of the "indicated" report, and persisted in similar efforts for years thereafter. *See* Document 102-3 (Exhibit 3 to Plaintiff's declaration submitted in support of Rule 15 motion previously made herein (letters from Plaintiff dated July 9, 2001, and July 24, 2003; letter to Plaintiff dated January 16, 2008)). After Plaintiff unsuccessfully sought help from the federal courts, Plaintiff's fair hearing in the state administrative forum (to which he was entitled by law, *see, e.g., Finch, supra,* 499 F. Supp. 2d at 528) was eventually held on July 14, 2008, some nine months after Defendant RICE's Brief had been filed on October 25, 2007. On or about September 22, 2008, the New York State Office of Children and Family Service's Bureau of Special Hearings rendered a decision (the "September 2008 Decision") ordering that "[t]he request of [Plaintiff] that the record of the report relating to him being maintained in the Central Register be amended to unfounded is granted" and finding that "the allegations of maltreatment against [Plaintiff] contained in the Central Register report have not been established by a fair preponderance of the evidence and as such, the report must be amended from indicated to unfounded and sealed." See JMM 56.1 ¶¶ 4, 8.

Notably, the sole factual basis ever alleged by OCFS or the affiliated agency for the "indication" of Plaintiff's "maltreatment" of his sons was that he

-13-

had "endangered" them by refusing to leave his home on or about August 23-24,

2000, upon Nassau County Police demand that he do so, made over the course of

twelve hours while they barricaded and surrounded his home, without a warrant

ever having been obtained for Plaintiff's arrest or for a search of the home:

> The Agency based its indication on the proposition that the Appellant's failure to surrender himself to the police and the fact that he allowed them to barricade his home for about twelve hours amounts to maltreatment of his one year old twins that were observed playing and being fed by their parents. To prove its case, the Agency presented the case notes of the investigative caseworker. The progress notes indicated that the children were seen playing and that the family was seen eating their dinner and not paying any attention to the officers outside their home. The Agency opined that the Appellant placed his children at risk of harm for not surrendering to the police when they knocked at his door. Based on that premise, the Agency concluded that the Appellant maltreated his children.

September 2008 Decision (in the record at Documents 105-3, 128) at pages 5-6.

See also *id.* at page 3, paragraph 6 (noting that "[t]he officers did not procure a

warrant to arrest or search [Plaintiff's] home" but that "rather[,] they barricaded

his property for about twelve hours").

Also noteworthy is that, under the applicable provisions of § 413 of the

New York Social Services Law, if any police officer or other law enforcement

official had had reasonable cause to believe that Plaintiff had committed any act

of child abuse or maltreatment over the course of those twelve hours during

-14-

which they barricaded and surrounded his home, they would have had a legal

obligation to make a report of suspected child abuse or maltreatment to OCFS

and/or the Nassau County Department of Social Services.  However, no police

officer or other law enforcement official made such a report.[6]

Plaintiff formally demanded of Defendant in November 2007 that she

withdraw the complained-of brief, informing her that the disclosure made in it

amounted to a misdemeanor under §422 of the New York Social Services Law.

See JMM 56.1 ¶ 5.  But Defendant never withdrew the brief.  See JMM 56.1 ¶ 7.

In May 2009, the complained-of brief became available on Westlaw®; in

June 2009, the petition for *certiorari* in this case was filed; in July 2009, this

case received national and international attention due in large part to its having

been discussed repeatedly during, and in connection with, the confirmation

hearings of Justice Sotomayor, who had been a member of the Second Circuit

panel that decided it.  Any legal academics, scholars, lawyers, law students, and

others who obtained a copy of the brief, either directly from Westlaw® or

another service, or by means of electronic replication and forwarding, learned

that "since Plaintiff's infant sons had been in the home at the time of the incident,

---

[6] Counsel for the District Attorney is well familiar, from other litigation, with the precise
identity of that no-longer-anonymous complainant, who was and is neither a police officer nor a
family member, but as it is not germane to this motion, that identity will not be disclosed here.

Office of Child Family Services investigated, concluded that the incident

'indicated' maltreatment of his sons, and Plaintiff was listed on the New York

State Child Abuse and Maltreatment Register."  Virtually all recipients of that

information would reasonably assume that since the "incident" occurred in 2000

and the brief was filed in 2007, the matter must have been adjudicated and the

"indicated" report found to have been supported, for who would suspect that such

adjudication had not occurred despite the passage of seven years?[7]


The § 1983 Claim Against RICE

To prevail on a claim under 42 U.S.C. § 1983, a plaintiff must allege (1)

that some person has deprived him of a federal right, and (2) that the person who

has deprived him of that right acted under color of state law.  *Velez v. Levy*, 401

F.3d 75, 84 (2d Cir.2005). Both those allegations have been made in the Second

Amended Complaint at ¶¶ 57-60, 84.

---

[7] More to the point regarding RICE's liability as a matter of law given her intersecting special roles as a District Attorney, as a party to this litigation, and as an attorney bound by the rules of ethics, who could reasonably believe that a District Attorney would allow such an accusation to be made on her behalf in a public document *unless* it were fully supported? Virtually none who have read the brief or will read it in the future (for it will persist in cyberspace indefinitely) would—or likely ever will—learn of the September 2008 Decision. The public "last word" on the matter is simply that James M. Maloney, the self-styled Plaintiff in the "Nunchaku Case," maltreated his own children.  Moreover, this legacy will pass on to those children themselves, who (even after they are long-since grown up and Plaintiff himself but a memory) will have the certainty that the brief and its once-and-forever disclosure remain on-line.

In the specific context of due process violations, courts "must first identify the [liberty or] property interest involved. Next, [they] must determine whether the plaintiff received constitutionally adequate process in the course of the deprivation." *O'Connor v. Pierson*, 426 F.3d 187, 196 (2d Cir. 2005) (citation omitted).  But the Second Circuit has also stated: "A person's interest in his or her good reputation alone, apart from a more tangible interest, is not a liberty or property interest sufficient to invoke the procedural protections of the Due Process Clause or create a cause of action under § 1983." *Patterson v. City of Utica*, 370 F.3d 322, 330 (2d Cir. 2004).

Here, Plaintiff believes he is able to surmount the latter obstacle, even without proving economic damages, for the following reasons.  First, there is the *sui generis* nature of the District Attorney's intersecting special roles as a District Attorney, as a party to this litigation, and as an attorney bound by the rules of ethics: should a federal court charged with enforcing federal rights as against state actors *fail* to find a deprivation of due process as a matter of law where it is undisputed that a public servant charged with enforcing the criminal law engaged in conduct that itself is arguably in violation of a criminal provision in order to advance her position in a civil matter?  Second, that criminal provision, § 422(12) of the New York Social Services Law, indisputably exists in order to protect the

due process rights of those who have been listed on the SCR (especially those who, like Plaintiff, had yet to receive a fair hearing). Third, as held in *Finch, supra*, 499 F. Supp. 2d at 538 (cited in full at page 11, *supra*), the inordinate delay in scheduling administrative hearings itself violates a listed person's right to due process. It follows that RICE's illegal disclosure, which was made seven years after the events it references and was all the more damaging because it was made more credible by that long delay,[8] must also be *per se* violative of a listed person's (here, Plaintiff's) right to due process, especially where, as here, Plaintiff had yet to receive a fair hearing.

Defendant deprived Plaintiff of constitutionally adequate process in branding him the subject of an indicated report, *see O'Connor v. Pierson, supra*, not only by virtue of her having made the complained-of disclosure before any hearing was held, but also by virtue of having maintained it even after notice to her and after the hearing and September 2008 decision. That permitting or encouraging such disclosure has been defined as a crime under § 422 of the New York Social Services Law, and that it has been so defined in order to protect

---

[8] *See supra* text on page 16 preceding footnote 7 (noting that "[v]irtually all recipients of that information [that Plaintiff was the subject of an 'indicated' report] would reasonably assume that since the 'incident' occurred in 2000 and the brief was filed in 2007, the matter must have been adjudicated and the 'indicated' report found to have been supported," and asking rhetorically, "[W]ho would suspect that such adjudication had not occurred despite the passage of seven years?").

persons such as Plaintiff from the harmful consequences of such disclosures,

should inform this Court regarding the scope and severity of the deprivation of

due process at issue here.

Section 422 of the New York Social Services Law

Section 422 of the New York Social Services Law specifically provides at

subdivision 12 (emphasis added below) as follows:

> Any person who willfully permits and any person who
> encourages the release of *any data and information
> contained in the central register* to persons or agencies
> not permitted by this title *shall be guilty of a class A
> misdemeanor*.

Earlier in the same § 422, at subdivision 3, the scope of the "information

contained in the central register" is broadly defined (emphasis added below):

> The central register shall include but not be limited to
> the following information: all the information in the
> written report; a record of the *final disposition of the
> report*, including services offered and services accepted;
> the plan for rehabilitative treatment; *the names* and
> identifying data, dates and circumstances of any person
> requesting or receiving information from the register;
> and any other information which the commissioner
> believes might be helpful in the furtherance of the
> purposes of this chapter.

As noted, the complained-of brief states that the "Office of Child Family

Services investigated, concluded that the incident 'indicated' maltreatment of his

-19-

sons [a reference to a final disposition], and Plaintiff was listed on the New York

State Child Abuse and Maltreatment Register [synonymous with the term

"central register" as used in the statute]."  It is undeniable that the information

disclosed in the brief amounts to "information contained in the central register,"

*see* § 422(3), and that it was willfully disclosed in the brief and willfully

maintained even after formal notice was given.  JMM 56.1 ¶¶ 5-8.

Finally, Defendant is not entitled to qualified immunity for making the

complained-of disclosure, because the provisions of subdivision 12 of § 422 of the

New York Social Services Law are unambiguous, and Defendant, a District

Attorney, could not reasonably have believed that such disclosure would deprive

Plaintiff of due process even if she reasonably believed her actions to be non-

prosecutable.  Moreover, Defendant was served with a formal demand that the

brief containing the complained-of disclosure be withdrawn, but the brief was

never withdrawn, substituted or modified, and now remains a permanent public

statement to the effect that Plaintiff "was listed on the New York State Child

Abuse and Maltreatment Register," etc.

## CONCLUSION

For all of the foregoing reasons, the application of the New York statutes to criminalize simple possession of nunchaku in one's home should be declared unconstitutional and of no force and effect, and this Court should further find that the District Attorney violated Plaintiff's due process rights by disclosing, or permitting to be disclosed, in order to advance her position in this litigation, that "Plaintiff was listed on the New York State Child Abuse and Maltreatment Register," and by failing to retract that disclosure after she was formally put on notice that it had been made and that it was statutorily confidential under threat of criminal penalty.

Dated:      December 16, 2013
            Port Washington, New York

                                    _____/s_____
                                    James M. Maloney (JM-5297)
                                    Plaintiff *pro se*
                                    33 Bayview Avenue
                                    Port Washington, New York

                                    (516) 767-1395